## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LINDA A. MILLER**
18251 Via Caprini Drive
Miromar Lakes, FL  33913,

         Plaintiff,

    v.

**5401 WESTERN AVENUE
RESIDENTIAL, LLC**
Serve: Lamont Hoffman, Registered Agent
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

**5401 WESTERN PNH, LLC,**
Serve: Lamont Hoffman, Managing
Member
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

**PN HOFFMAN REALTY, LLC**
Serve: Lamont Hoffman, Managing
Member
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

    and

**LAMONT HOFFMAN**
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

       Defendants.

Civil No. _____

## COMPLAINT

COMES NOW Plaintiff, Linda A. Miller ("Miller"), by counsel, and herewith files her Complaint against the Defendants, for violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA" or "Act"), 15 U.S.C. § 1701 *et seq.*, and pendent state claims, and in support thereof aver:

### *Parties, Jurisdiction and Venue*

1.    Miller is an adult citizen and resident of the State of Florida. Miller is a purchaser within the meaning of 15 U.S.C. § 1701(10).

2.    Defendant 5401 Western Avenue Residential, LLC ("5401 Residential") is, upon information and belief, a limited liability company organized under the laws of Delaware, and authorized to do business in, the District of Columbia.

3.    Defendant 5401 Western PNH, LLC ("5401 PNH") is, upon information and belief, a limited liability company organized under the laws of Delaware, and authorized to do business in, the District of Columbia.  5401 PNH is the managing member of 5401 Residential.

4.    Defendant PN Hoffman Realty, LLC ("PNH") is a District of Columbia limited liability company duly authorized to conduct business in the District of Columbia.  Upon information and belief, it sometimes trades as, or uses as a fictitious name, "PN Hoffman, Inc."  No such entity known as PN Hoffman, Inc., is organized and registered in the

2

District of Columbia. For purposes of this Complaint, PNH shall include, and also refer to, the organization known and referred to as PN Hoffman, Inc.

5.    Defendant Lamont Hoffman ("Hoffman") is the managing member of 5401 PNH, and PNH. He also is an owner or person in control of related entities engaged in interstate real estate development and sales subjecting him to regulation under the Act.

6.    Each of 5401 Residential, 5401 PNH, PNH, and Hoffman is a developer, within the definition provided in 15 U.S.C. § 1701(5), as it relates to a subdivision, as defined in 15 U.S.C. § 1701(3), known as "Chase Point Condominium," located at 4301 Military Road, NW, Washington, DC 20016.

7.    Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 1719.

8.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. § 1719.

9.    All acts complained about and which give rise to these causes of action occurred in this District, and they all relate to the sale of real property interests covered by the Act located in this District.

### Facts Common to All Counts

3

10.    On or about August 22, 2005, Miller entered into a sales contract (the "Contract") with 5401 Residential, as the owner or contract purchaser of the property, for the right to purchase Unit 709 (the "Unit"), together with limited common element parking space number 150 for a total price of One Million Four Hundred-Fourteen Thousand Nine Hundred Dollars ($1,414,900.00), in a to be built condominium project to be known as "The Chase Point Condominium." On that same date, Miller gave 5401 LLC a deposit therefor of Seventy-Thousand Seven Hundred Forty-five Dollars ($70,745.00) (the "Deposit"). 5401 LLC ratified the Contract on or about that same date. A copy of the ratified Contract is attached hereto as Exhibit 1, and the provisions thereof are incorporated herein by this reference.

11.    On or about February 21, 2007, Miller and 5401 Residential entered into an amendment to the Contract for certain options (the "Options") and Miller paid an additional One Thousand Nine Hundred Ninety-nine and 50/100 Dollars ($1,999.50) to 5401 Residential therefor. Hereafter, the term Deposit, shall include the payment for the Options. A copy of the amendment is attached hereto as Exhibit 2, and the provisions thereof are incorporated herein by this reference.

12.    Contract § 2.2 obligated 5401 Residential to hold the Deposit "in an interest-bearing escrow account in a bank or savings and loan association" as required by local law.  Any interest earned on the Deposit was to be added thereto.  But, according to 5401 Residential, the Deposit would "not be deemed to include any amounts paid for Options," as defined in the Contract.

13.    Section 2.3, of the Contract provided that the Deposit would be credited to Miller if the parties closed the transaction.  Otherwise, if Miller defaulted, it would be forfeited to 5401 Residential.  In addition, the Contract provided that Miller would forfeit any other amounts paid under the Contract including any amounts paid for Options, which 5401 Residential would retain as "liquidated damages."

14.    Section 7.4 of 5401 Residential's Contract with Miller provided that if closing did not occur within twenty-four months after the execution of the Contract by Miller (August 21, 2007) due to reasons within 5401 Residential's control, but before 5401 Residential established a closing date, Miller's only remedy was to terminate the Contract by written notice to 5401 Residential and receive a refund of the Deposit (but not the cost of Options), or wait until the Unit was completed and 5401 Residential called for closing.  These remedies were

declared to be Miller's "sole and exclusive remedies in the event of any default" by 5401 Residential, "it being expressly agreed and understood that [Miller] . . . [was required to] waive[ ] any claims against [5401 Residential] for any monetary or consequential damages of any kind." This Contract provision eliminated Miller' right to sue for specific performance and or damages under District of Columbia law.

15.    5401 Residential's Contract with Miller only obligated 5401 Residential to use "reasonable efforts to complete construction of the Unit," and convey it within the time when 5401 Residential was legally obligated to do so, viz., August 21, 2007, and further reserved to itself the right to delay its obligation to close beyond that date "for reasons beyond the control of 5401 Residential," which 5401 Residential defined without limitation, to include "impossibility of performance, acts of God, fire, earthquake, flood, explosion, terrorism, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse 5401 Residential from completing the Unit" within the required time.  Finally, if closing did not occur due to any of those reasons, 5401 Residential's sole obligation to Miller was to refund the Deposit (including the amount of the Options).

16.    Miller declined to close, and 5401 Residential forfeited Miller Deposit.

17.    Miller received a copy of the "Public Offering Statement," filed with the District of Columbia, Department of Consumer and Regulatory Affairs ("POS").  Upon information and belief the POS was not issued pursuant to state law and regulation certified by HUD pursuant to 15 U.S.C. § 1708.

18.    As a result of the Defendants' joint or several conduct, Miller has been damaged in an amount equal to not less than the amount of the Deposit, loss of use of said funds, including accrued interest thereon prior to forfeiture, loss of use of said funds since said wrongful forfeiture, attorneys fees and other litigation expenses incurred and to be incurred, and such other damages as shall become apparent hereinafter.

## COUNT I
### *(Violation of ILSFDA - Failure to Register)*

19.    Miller incorporates herein by reference all of the above allegations as if restated in full.

20.    At the time the Contract was executed, there was no statement of record with respect to the Unit or The Chase Point Condominium on file with the Secretary of the Department of Housing

and Urban Development ("HUD"), as required by 15 U.S.C. §§ 1703(a)(1)(A), 1704, 1706.

21.     5401 Residential is one of several entities controlled or owned by PNH.  In addition to the Chase Point Condominium, PNH claims ownership or control of developments known as The Alta at Thomas Circle, Washington, DC containing 126 condominium units; The Condominiums at Carlyle Square (in conjunction with Post Properties) in Alexandria, VA; The Flats at Union Row, in Washington, DC, with over 200 units, and The Warehouses at Union Row with not less than 50 units.  PNH advertises and solicits sales of these residential real estate interests in interstate commerce utilizing the mail, Internet and other telecommunications devices and methods.  Upon information and belief, none of these developments are covered by a statement of record on file with HUD as required by 15 U.S.C. §§ 1703(a)(1)(A), 1704, 1706.

22.     The methods and means by which Defendants conduct their business with respect to The Chase Condominium and other projects constitutes a common promotional plan including, without limitation, common advertising, common ownership, and same or similar name or brand identity, and common sales activities, including a common sales center within the meaning of 15 U.S.C. § 1701(4).

8

23.    Alternatively, The Chase Condominium alone, is not subject to or covered by any registration exemption under the Act.

24.    Miller first discovered the violations of the Act when she consulted counsel after 5401 Residential, failed and refused to refund her Deposit.  Since discovering 5401 Residential's violation of the ILSFDA, Miller made one additional written request through counsel prior to filing this suit, requesting that 5401 Residential rescind the Contract and refund Miller's Deposit.  5401 Residential, has failed to respond affirmatively to the request.  A copy of the letter to 5401 Residential is annexed hereto as Exhibit 3, and the terms thereof incorporated by this reference.

25.    Defendants 5401 PNH, Hoffman, and PNH are statutorily liable for the acts and conduct of 5401 Residential pursuant to the Act.

## COUNT II
### *(Violation of ILSFDA - Failure to Deliver Property Report)*

26.    Miller incorporates herein by reference all of the allegations in paragraphs 1-28, and 30 -36, as if restated in full.

27.    At no time prior to the date Miller executed the Contract did any of the Defendants deliver to Miller the interstate land sale property report required by 15 U.S.C. § 1703(a) ("HUD Property Report").

9

28.   The Contract fails to include the information required by the ILSDA when the HUD Property Report is not delivered prior to the execution of the Contract.

29.   At no time since signing the Contract, has Miller received the required HUD Property Report.

**COUNT III**
*(Violation of ILSFDA - False Statements)*

30.   Miller incorporates herein by reference all of the allegations in paragraphs 1-29, 30-36, and 38-40, as if restated in full.

31.   The POS, other advertising and promotional material, and the statements of Defendants' agents, at various times communicated, or contained, information which was misleading and false including the size of the Unit in violation of 15 U.S.C. § 1703(a).

32.   The Defendants, and or their agents at various times communicated or delivered documents that were false and misleading to the detriment of Miller's statutory rights in that they contained, false or misleading information which lulled Miller into waiving certain of their statutory rights including, but not limited to, the failure to advise Miller in writing that they had a period of time to rescind the Contract and receive in return the Deposit in full after filing of the required registration statement with HUD.

10

## COUNT IV
*(Violation of DC Consumer Protection Act)*

33.    Miller incorporates herein by reference all of the preceding allegations, as if restated in full.

34.    This pendent state law cause of action arises under DC Code § 28-3901 *et seq.,* the District of Columbia Consumer Protection Act ("DCCPA").

35.    Miller is a person and consumer under the DCCPA. 5401 Residential, and/or one or more of the other Defendants are merchants under the DCCPA.

36.    The sale of the Unit constitutes a real estate sale covered by the DCCPA.

37.    5401 Residential, and/or one or more of the other Defendants engaged in an act or acts which constitute a trade practice or trade practices under the DCCPA with respect to the sale of the Unit to Miller.

38.    5401 Residential, and/or one or more of the other Defendants engaged in one or more unlawful trade practices as defined in § 28-3904 of the DCCPA, including but not limited to failure to provide information which would have protected her Deposit under other DC and federal laws which misled Miller; and by making and enforcing unconscionable terms or provisions in the Unit sales contract.

11

### *Relief Requested*

Wherefore, Miller prays for judgment, jointly and severally against

the Defendants as the proof may show for:

    A.     Rescission of the Contract, and/or

    B.     Damages equal to the Deposit, and

    C.     Damages equal to all interest that accrued on the Deposit
prior to forfeiture by 5401 Residential, and

    D.     Damages equal to the lost opportunity value of the Deposit
from the date of forfeiture through the date of judgment; and

    E.     Attorneys' fees and other litigation costs; and

    F.     Such other and further relief as to the Court seems just and
proper.

### *Jury Demand*

Plaintiffs request a trial by jury as to all issues so triable.

Respectfully submitted,

**FRIEDLANDER, MISLER, SLOAN, KLETZKIN &
OCHSMAN, PLLC**

By: *Robert E. Greenberg*

Robert E. Greenberg, Esq. #173708
Thomas F. Murphy, Esq. #464475
1101 17th Street, NW
Suite 700
Washington, DC  20036-4704
(202) 872-0800

*Attorneys for Plaintiffs*

12

Exhibit 1

# CHASE POINT CONDOMINIUM
## CONDOMINIUM UNIT PURCHASE AGREEMENT

Title to be conveyed in the name(s) of:

Linda A. Miller

Unit No: 709                                              Percentage Interest: 1.00%
L.C.E. Parking Space(s) No.:162
L.C.E. Storage Space No.: N/A

THIS CONDOMINIUM UNIT PURCHASE AGREEMENT (the "Agreement") is made between 5401 Western Avenue Residential, LLC, ("Seller"), and Linda A. Miller ("Purchaser").

Seller desires to sell and Purchaser desires to purchase Condominium Unit No: 709 together with the exclusive right to use and occupy Limited Common Element Parking Space(s) Nos: 162, if applicable and/or Limited Common Element Storage Space No. N/A, in CHASE POINT CONDOMINIUM (the "Condominium"), located at 4301 Military Road, N.W., Washington, D.C. 20015.

Seller and Purchaser, for good and valuable consideration, agree as follows:

1. PURCHASE AND SALE OF UNIT.

    1.1  Seller agrees to sell to Purchaser, and Purchaser agrees to purchase, the Condominium Unit(s) identified in the Condominium Declaration as Unit Number 709 (the "Unit"), together with the undivided interest in the Common Elements as set forth in the Declaration for the Condominium, and if applicable, the exclusive right to use and occupy the parking space(s) identified as Limited Common Element Parking Space Number(s) 162 (hereinafter, if applicable, collectively referred to as the "Parking Space"), and if applicable, the exclusive right to use and occupy the storage space identified as Limited Common Element Storage Space  Number N/A (hereinafter the "Storage Space").  The Unit's percentage interest in the Common Elements of the Condominium (the "Percentage Interest") as set forth in Exhibit B to the Condominium Declaration is 1.00%.  The Unit shall be conveyed "as is", except as otherwise set forth in the Limited Condominium Warranty attached hereto as Exhibit "F", and unfurnished.  Any furnishings and personal property displayed in any model unit or in any PN Hoffman, Inc. Sales and Design Center (the "Sales and Design Center") are not part of the Unit and are not included in the purchase price of the Unit. All illustrations, models, architectural renderings and unit features shown on any promotional or other materials provided to Purchaser, or exhibited in the Sales and Design Center, are for display or illustrative purposes only, and may not be representative of the Unit or the Condominium building features.  Additionally, any features of the Unit or Condominium building shown on any floor plans, marketing materials, plats, plans, or any other promotional materials are subject to change by Seller in its discretion

1



due to such factors as, but not limited to, building constraints, inspections and permitting approvals. Estimated dimensions or square footages shown in any floor plan sketches or provided in other related sales materials are approximations only, and Purchaser acknowledges that the Unit, Parking Space, and Storage Space are *not* being sold on a per square foot basis. The Parking Space and Storage Space are also being sold in an "as is" condition, and the Purchaser acknowledges that the Parking Space and Storage Space will be delivered unimproved, except as otherwise provided herein. All references herein to the "Unit" shall be deemed to include the Residential Unit (as defined in the Declaration, unless otherwise noted herein or the context indicates otherwise), and, as applicable, all Limited Common Elements to be assigned to the Residential Unit as provided herein.

   2.  PURCHASE PRICE AND TERMS OF PAYMENT.

      2.1 The purchase price of the Unit, and the consideration for the assignment of the parking space 162, is One Million Four Hundred Fourteen Thousand Nine Hundred Dollars ($1,414,900). The consideration for the assignment of the Storage Space, if applicable, is N/A. The total purchase price for the Unit and, if applicable, the consideration for the Parking Space and/or Storage Space (such total purchase price, exclusive of settlement costs, condominium fees, and prorated amounts of prepaid items, is collectively referred to as the "Total Purchase Price") shall be paid as follows:

(1)  Initial Deposit upon signing this Agreement, to be applied as partial

      payment of the Total Purchase Price, receipt of which amount
      is hereby acknowledged                                          $ 70,745

(2)  Additional Deposit due on the date that is one (1) year after the date

      of this Agreement, but in no event later than June 30, 2006     $ 70,745

(3)  (a.) _____Proceeds of conventional loan. (b.) _____ All cash.   TBD

(4)  Balance Due at time of Settlement, in cash or by
      certified or cashier's check.                                   TBD

      **Total Purchase Price**...................................................... **$1,414,900**

The Total Purchase Price may be subject to adjustments, including but not limited to, fees for additional Options (as defined hereinafter), as more fully set forth in Paragraph 15 of this Agreement, which adjustments shall be reflected in a Change Order Addendum, which is attached as Exhibit "C" hereto. The Initial Deposit and the Additional Deposit are referred to herein collectively as the "Deposit".



2.2  Seller shall place Purchaser's Deposit in escrow in an interest-bearing escrow account in a bank or savings and loan association in an escrow account pursuant to Section 42-1904.09 of the Condominium Act.  The Deposit shall be credited to Purchaser at Settlement (as defined in Paragraph 7) and the Total Purchase Price shall be paid to Seller by certified or cashier's check at Settlement.  The term "Deposit" includes any interest earned on any deposit made by the Purchaser under this Agreement.  The Deposit shall not be deemed to include any amounts paid for Options.

2.3  The Deposit shall be disbursed upon the following terms:  (a) if Settlement is made, the Deposit will be delivered to Seller at the time of Settlement, or (b) if Settlement is not made as provided herein because of Purchaser's default or failure to comply with any term of this Agreement, Purchaser shall forfeit the Deposit and any other amounts paid under this Agreement, including any amounts paid for Options, which may be retained by Seller as liquidated damages.

3.  FINANCING

Purchaser hereby elects the following method of financing, pursuant to the terms of this Agreement:

(Check One)

    _____  No financing arrangement (all cash)

    \_\_\_X\_\_\_  Financing arranged through lender of Purchaser's choice

    _____  Financing arranged through Seller's designated lender (a "Designated Lender")

Irrespective of whether Purchaser elects to pursue financing through a lender or pay all cash at Settlement, Purchaser must submit a written pre-approval letter from a lender prior to ratification of this Agreement.

3.1  <u>Cash or Purchaser's Lender</u>.  Regardless of whether Purchaser elects to pay the Total Purchase Price all in cash, or whether Purchaser elects to place a mortgage or deed of trust on the Unit with a lender of Purchaser's choice or a Designated Lender, this Agreement shall be in no way contingent upon Purchaser obtaining financing, and Purchaser assumes full responsibility to initiate and pursue all steps necessary to obtain the funds required for Settlement.  Further, Purchaser shall provide Seller, within ten (10) days after any request therefore, proof of Purchaser's financial ability to pay the Total Purchase Price at Settlement.  If Purchaser fails to provide proof reasonably satisfactory to Seller, Seller at its sole option, may terminate this Agreement and retain the Deposit, and any amounts paid for Options.  **The Purchaser acknowledges that the purchase of the Unit is in no way contingent on Purchaser's ability to obtain financing for its proposed purchase of the Unit, whether from a lender of Purchaser's choice, or a Designated Lender.**

3



3.2  <u>Designated Lender</u>.  If Purchaser elects to obtain financing from a Designated Lender, then Purchaser shall, in addition to obtaining a pre-approval letter from the Designated Lender, make prompt, diligent and truthful application to the Designated Lender no later than fifteen (15) days after the expiration of Purchaser's right to cancel, as set forth in Paragraph 26 below.  Purchaser shall complete all mortgage credit applications and other similar forms provided by the Designated Lender promptly after receipt, and if such forms are not submitted to the Designated Lender properly and fully executed within fifteen (15) days after the request for the same, then this Agreement, at the sole option of Seller, *may* be terminated and the Deposit retained by Seller. Purchaser shall comply with the terms of any commitment from the Designated Lender.

In the event that the Designated Lender finances the purchase of the Unit and Purchaser selects the settlement company set forth in Paragraph 7.1 below, Seller will credit Purchaser an amount equal to 50 basis points of Purchaser's first trust loan amount, not to exceed Five Thousand Dollars ($5,000.00) towards closing costs at Settlement and Purchaser will pay all other settlement costs and lender's fees. In the event that Purchaser elects to obtain financing from a lender of Purchaser's choice, or in the event that Purchaser selects its own settlement company to conduct settlement, Purchaser shall pay all settlement costs and lender's fees including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees, and Seller shall not be obligated to pay any fees charged by a lender or Purchaser's settlement company.

Purchaser's credit will be subject to approval by the Designated Lender making such mortgage loan, and Seller will have no liability or responsibility in the event Purchaser is unable to obtain the financing required for Settlement from the Designated Lender.

PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT SHALL IN NO WAY BE CONTINGENT UPON FINANCING, AND IRRESPECTIVE OF WHETHER A DESIGNATED LENDER OR A LENDER OF PURCHASER'S CHOOSING IS UTILIZED, PURCHASER ASSUMES FULL RESPONSIBLILTY TO INITIATE AND PURSUE ALL STEPS NECESSARY TO OBTAIN THE FUNDS REQUIRED FOR SETTLEMENT. PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT CONTINGENT UPON THE SALE OR RENTAL OF PURCHASER'S PRESENT HOME, IF ANY, OR ANY OTHER PROPERTY, AND THAT ANY CONTINGENCY A LENDER MAY SET FORTH IN A PREAPPROVAL LETTER IS A CONTINGENCY SOLELY PLACED ON PURCHASER.

Purchaser promptly shall advise Seller in writing of any material change in Purchaser's financial condition.

4

4. UNIT OWNERS ASSOCIATION.

4.1  A condominium unit owners association (the "Association") will be established for the purpose of operating and maintaining the Condominium. Each owner of a unit in the Condominium automatically will be a member of the Association and will be subject to the Declaration, the Bylaws and the Condominium Rules and Regulations. The voting rights of each unit owner are set forth in the Declaration and the Bylaws. The affairs of the Association will be conducted by a Board of Directors, as set forth in the Bylaws. The initial Board of Directors will be appointed by the Seller. Not later than the time that units to which twenty-five percent (25%) of the Percentage Interests in the Common Elements (as defined in the Declaration for the Condominium) appertain have been conveyed, a special meeting of the Association shall be held at which not less than twenty-five percent (25%) of the members of the Board of Directors shall be elected by unit owners (other than the Declarant), who shall serve until the date of the first annual meeting of the Association. Not later than the time that units to which fifty percent (50%) of the Percentage Interests in the Common Elements appertain have been conveyed, a special meeting of the Association shall be held at which not less than thirty-three and one-third percent (33-1/3%) of the members of the Board of Directors shall be elected by unit owners (other than the Declarant) who shall serve until the date of the first annual meeting of the Association. The first annual meeting of the Association shall be held at a time and place to be designated by the Board of Directors: (i) within two (2) years from the date that the first unit is conveyed, or (ii) within ninety (90) days after units to which seventy-five percent (75%) of the Percentage Interests in the Common Elements appertain have been conveyed, whichever date first occurs, or (iii) on such earlier date as may be established by the Board of Directors. The total number of Directors after control is turned over will be five (5). The procedures for election of the Directors are set forth in Bylaws which are an Exhibit to the Public Offering Statement.

5. CONDOMINIUM ASSESSMENTS.

5.1  Purchaser is obligated and agrees to pay monthly his or her Unit's Percentage Interest of the Common Expenses of the Condominium, as set forth in the Declaration. Seller's estimate of the monthly Condominium fee is $659.07 for the Unit and the first Parking Space. Additionally, each owner of an additional Limited Common Element Parking Space will be charged initially a monthly fee of $25.00, and each owner of a Limited Common Element Storage Space will be charged initially a monthly fee of $15.00, such fees being subject to the same annual increases as the Condominium fees for the Units. The aforementioned fees are only estimates and are not guaranteed by Seller.

5



6. CONVEYANCE OF TITLE.

6.1  At Settlement, Seller shall convey to Purchaser good and merchantable title to the Unit (together with the Unit's respective undivided Percentage Interest in the Common Elements) by special warranty deed, subject only to the general real estate taxes and water and sewer assessments for the current tax year not then due; the Condominium Act of 1976 Technical and Clarifying Amendment Act of 1992 as the same may be amended, the Declaration, Bylaws, Plat and Plans and Rules and Regulations of the Condominium; easements, covenants and conditions of record; ordinances and regulations of competent municipal or other governmental authorities; the Zoning Order (defined in Paragraph 33.1 below); easements for sewers, water, gas, fuel line, drainage, electric, telephone and other similar utilities, if any, granted or to be granted; and Purchaser's deed of trust, if any.  Purchaser shall, upon request, execute any instruments creating or consenting to such covenants, conditions, easements, or restrictions.  At the time of Settlement, Seller will also cause the Parking Space and Storage Space, if applicable, to be assigned to the Unit being purchased as a Limited Common Element.

6.2  In the event that, upon examination, the title should be found defective and the defects are of such character that they may be remedied within a reasonable time by legal action to perfect the title, such action must be taken promptly by and at Seller's reasonable expense, whereupon the time herein specified for full settlement by the Purchaser will thereby be extended for the period necessary for such action.  If Seller is unable to perfect title as specified herein, then Seller may terminate this Agreement and cause the Deposit and any advance for Options to be returned to Purchaser.  In such case, Seller is expressly released from all other liability for damages arising from such event, and in no event shall Seller be liable for any damages for defects in title.  If Seller chooses to terminate this Agreement and return the Deposit and advance payments for Options to Purchaser pursuant to this Paragraph, then all rights and liabilities of the parties under this Agreement shall forthwith terminate.

7. SETTLEMENT.

7.1  Settlement on the purchase and sale of the Unit (the "Settlement") shall occur on a date specified by a written notice from Seller to Purchaser stating that the Unit will be ready for conveyance by Seller (subject to completion of punch list items as set forth below in Paragraph 9.1) on the specified date, which date will be no earlier than ten (10) days from the date of the notice. Purchaser shall complete Settlement on the date specified by Seller.  Purchaser shall be responsible for ensuring that Settlement occurs on the date specified, and if Settlement is delayed due to Purchaser or Purchaser's lender (or the settlement company selected by Purchaser), then Purchaser shall pay to Seller at Settlement $165.00 for each day that Settlement is delayed beyond the specified date. At Settlement, Purchaser shall pay the Total Purchase Price for the Unit and, upon receipt thereof, Seller shall deliver the deed for the Unit.  Purchaser shall be entitled to occupy and have possession of the Unit from and after Settlement.  Purchaser shall pay at Settlement all settlement costs not previously paid, including, without limitation, credit

6



report fee, lender's appraisal fee, District of Columbia Real Property Recordation Tax (1.1%), document recordation charges, fees for title examination, preparation of all documents of conveyancing and all mortgage instruments, settlement fees, notary fees, and fees for mortgagee's title insurance, private mortgage insurance premiums, if any, any loan origination, discount or similar fees, and fees for owners title insurance (if obtained) and other charges in the nature of prepaid expenses, escrows for taxes and the like. Purchaser shall also pay all Condominium assessments and initial capital contribution, as set forth in Paragraphs 5 and 7.2 respectively, due at Settlement. Seller will pay the D.C. Transfer Tax (1.1%) and, if one of the below-listed mortgage lenders (including the loan officer listed below) identified below is selected for Settlement, Seller will credit Purchaser an amount equal to 50 basis points of Purchaser's first trust loan amount, not to exceed Five Thousand Dollars ($5,000.00), towards the settlement charges otherwise chargeable to Purchaser:

<u>Seller's Designated Lenders:</u>
First Savings Mortgage Corporation
10401 Connecticut Avenue, Suite 103
Kensington, Maryland 20895
Contact: Renee Schuster Voyta, VP

Wells Fargo
12701 Fair Lakes Circle, Suite 275
Fairfax, VA 22033

Contact: Scott Hawkins, Consultant

National City Mortgage
6110 Executive Blvd, #250
Rockville, MD 20852
Contact: Leonard Gordon, Branch Manager

In the event that Purchaser decides to select a lender or loan officer for Designated Lender other than as indicated above, Purchaser shall not be entitled to the payment of settlement charges by Seller as set forth above. Purchaser shall notify Seller in writing not less than sixty (60) days prior to the projected date of Settlement of its selection of settlement company or settlement attorney. If no such notice is given to Seller within the aforementioned time period, then Seller may designate the title attorney or title company to conduct Settlement.

7.2 Purchaser shall pay at Settlement as an initial capital contribution to the Condominium, an amount equal to two times (2x) the "Estimated Monthly Assessment" (Condominium fee) for the Unit as set forth in Exhibit V-B of the Public Offering Statement. This initial capital contribution will be allocated to the Condominium's working capital. This initial capital contribution is in addition to, and not in lieu of, the regular monthly Condominium fee, which will be prorated at Settlement, and is nonrefundable.

7



7.3 Purchaser hereby acknowledges that any information given to Purchaser by Seller, or any sales representative, employee, or agent of Seller with respect to anticipated dates for the delivery of title and possession of the Unit is not to be considered a material part of this Agreement or a material representation or warranty by Seller.

7.4 (a) If Settlement shall not have occurred within twenty-four (24) months after the execution of this Agreement by Purchaser, due to reasons within Seller's control, Purchaser's sole remedies shall be either:

(i)    terminating this Agreement by written notice to Seller, delivered at any time prior to Seller's establishment of a settlement date as provided in Section 7.1 of this Agreement, in which event Seller shall, if Purchaser shall not then be in default, cause the Deposit and all other payments made by Purchaser to Seller hereunder, if any, to be returned to Purchaser, and neither party shall have any further liability or obligation hereunder; or

(ii)    electing to proceed with the purchase of the Unit when the Unit is completed.

The remedies specified herein shall be the sole and exclusive remedies of the Purchaser in the event of any default by Seller, it being expressly agreed and understood that Purchaser hereby waives any claims against Seller for any monetary or consequential damages of any kind.

(b) Seller shall use reasonable efforts to complete construction of the Unit, and Settlement on such Unit shall occur when Seller is legally permitted to convey the Unit, within twenty-four (24) months after execution of this Agreement by Purchaser; provided, however, that if Seller is delayed in the performance of the aforesaid obligation for reasons beyond the control of Seller, then the time for performance of Seller's obligation shall be extended for a reasonable period of time, and such delay shall not be considered a breach of this Agreement, provided that in no event shall Settlement be extended to a date more than thirty-six (36) months after execution of this Agreement by Purchaser. Reasons beyond the control of Seller shall include, without limitation, impossibility of performance, acts of God, fire, earthquake, flood, explosion, terrorism, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse Seller from completing the Unit within such twenty-four (24)-month period. Notwithstanding anything to the contrary in this Agreement, if Settlement does not occur due to reasons set forth in this Paragraph, then Seller's sole obligation to Purchaser shall be to cause the Deposit and fees paid for Options to be returned to Purchaser.

8. SETTLEMENT ADJUSTMENTS.

8.1 All monthly condominium assessments for the month in which Settlement is made, if any, real property taxes, insurance premiums, any assessments of water, sewer, or

8

similar services to the Condominium, and any other prepaid or pro-ratable items shall be prorated between Purchaser and Seller as of the date upon which Seller is prepared to close according to the terms of this Agreement.  Thereafter, each of these items shall be assumed and paid by Purchaser.  In the event that at time of Settlement any such item has not been allocated among the units the total of such items for the Condominium shall be allocated among the units (on an estimated basis, if necessary) in accordance with each unit's Percentage Interest as set forth in the Declaration.

    9.  INSPECTIONS.

    9.1  <u>Pre-Settlement Inspection</u>.  Seller shall notify Purchaser not less than ten (10) days prior to Settlement of the date and time that the Unit will be ready for inspection. Upon receipt of such notice, Purchaser shall promptly arrange for an appointment with a representative of Seller to make the pre-settlement inspection. At such inspection, the Pre-Settlement Inspection Form (the "Report") set forth as an exhibit hereto shall be completed and executed by Purchaser and by a representative of Seller. Purchaser shall attend such inspection and participate in completing the Report prior to Settlement. Seller shall complete, install or repair (as the case may be) any such "punch list" items noted on the Report within a reasonable time, but in no event shall the existence of any such items be a bar to Settlement or a ground to postpone Settlement beyond the time otherwise appointed in accordance with the terms of this Agreement. At Settlement, no escrows for such items shall be established for any reason or under any circumstance whatsoever. Failure of Purchaser to arrange for a pre-settlement inspection within the aforementioned ten (10) day period or failure of Purchaser to keep the inspection appointment shall constitute full acceptance of the Unit by Purchaser.  Upon acceptance of the deed by the Purchaser, Purchaser agrees to hold Seller free from liability for any  visible defects not specifically noted in the Report; provided the terms detailed in the "Limited Condominium Warranty" will govern the limit of Seller's responsibility with respect to items covered by such warranty. After Settlement, Purchaser is responsible to allow adequate access to the Unit for Seller to remedy items noted on the Report during normal working hours and as mutually agreeable. The Report is Purchaser's warranty by Seller that any incomplete work will be done as promptly as materials, weather and workload permit.

    9.2  <u>Move-in / Move-out Policy.</u>  The Purchaser shall abide by the move-in / move-out policy for the Condominium as referenced in the Bylaws, and in accordance with the move-in schedule established by Seller. The Purchaser shall be responsible for any damage to the common areas of the Condominium building (including the elevators and hallways) and to the Unit resulting from the initial move-in after Settlement (whether by Purchaser, its invitees or tenants).  A move-in fee of $200.00 shall be payable for all move-ins, including the initial move-ins by the first occupants of the Unit (which shall be collected at Settlement).



10. WARRANTY.

10.1  At Settlement, Seller shall deliver to Purchaser an executed warranty in the form set forth in the "Limited Condominium Warranty" attached hereto as Exhibit "F". Seller reserves the right at its option and at any time (either before or after the sale of a unit) to grant additional warranties with respect to any unit or the common elements.

11. RISKS.

11.1  The risk of loss or damage to the Unit by fire or other casualty is assumed by Seller until the time of Settlement. If such loss or damage occurs, Seller may terminate this Agreement and refund the Deposit and any advance paid for Options to Purchaser hereunder without further liability or obligation to Purchaser. Purchaser shall have no right or claim to fire or other casualty insurance proceeds.

12. DEFAULT, SUBORDINATION, MERGER AND ASSIGNMENT.

12.1  If Purchaser shall default in any of the payments or other obligations called for in this Agreement, and fails to cure such default within the ten (10) days after written notice from Seller, then at the option of Seller, Purchaser shall forfeit any and all rights under this Agreement, and any amount theretofore paid under the terms of this Agreement may be retained by Seller as liquidated damages. If for any reason whatsoever Seller shall be unable to deliver title in accordance with the provisions of this Agreement, Seller's liability shall be limited to the return of any payments made by Purchaser hereunder.

12.2  Purchaser's interest in this Agreement shall be subordinate to any lien placed by Seller against the Unit or the Condominium at any time prior to Settlement. Purchaser agrees to execute such further assurances of this covenant as may be required from time to time by Seller. Seller shall cause any such lien against the Unit to be released at or prior to Settlement, to the extent required by Paragraph 6 of this Agreement.

12.3  This Agreement shall be binding upon the parties hereto, and, as applicable, each of their respective heirs, personal representatives and successors.

12.4  This Agreement is personal to Purchaser and is not assignable by Purchaser either voluntarily, by operation of law, or otherwise. Seller may assign its rights hereunder in Seller's sole discretion.

13. URBAN CONDITIONS.

13.1  Purchaser is purchasing the Unit subject to, and accepts all the risks associated with, conditions related to urban environments including, but not limited, to noise created by adjacent neighbors/property owners, bars, restaurants, nightclubs, construction,

10



general street traffic, emergency vehicles, aircraft, general airport noise, noise and vibrations common in multi-dwelling buildings (from equipment such as, including but not limited to, exhaust fans and air condenser units) and other noise common in urban settings; common urban pests; vibrations from large vehicles such as trash trucks, buses, metrorail trains and street cleaning equipment; smells including trash and other smells from adjacent properties or other units in a multi-dwelling building, and, future development of surrounding property that may impact including, but not limited to, the light and air of the Unit.

14. SPECIFICATIONS.

14.1  Specifications for the Unit are listed and included with this Agreement as Exhibit "A" hereto (the "Specifications"). These Specifications include the appliances, finishes, and the general characteristics of the Unit. Seller reserves the right to substitute manufactured items or products in the Unit should sources become unavailable.

14.2  A conceptual sketch of the Unit is shown on Exhibit "B" attached hereto. This sketch generally delineates the rooms and layout of the Unit. The sketch is conceptual in nature and is not intended to be scaled for room dimensions. Final build-out of walls, ceilings, kitchen, baths, bedrooms, and specific features and details of the Unit may vary from the conceptual sketch due to construction constraints beyond the Seller's control or actual knowledge and Purchaser shall hold Seller harmless for such constraints on the final build-out of the Unit.

14.3  Furniture, wallcoverings, furnishings or the like as shown in or about any model unit, sales materials, renderings, or the Sales and Design Center are for display purposes only and are not considered a part of the Unit for the purposes of this Agreement. Further, the location of wall switches, thermostats, chases, exposed ductwork, exposed sprinkler lines and heads, vents, exposed plumbing lines, plumbing, electrical outlets, fireplaces (if applicable), and similar items may vary from unit to unit and may not be as shown in any model unit and any marketing materials. Any floor plans, sketches or sales drawings shown to Purchaser are for general illustrative purposes only and may not be in accordance with the final build-out of the Unit. The Unit is being sold unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Unit by Purchaser, unless otherwise noted (including the appliances and equipment set forth in the Specifications). Seller will finish and equip the Unit only in accordance with the Specifications and Special Amenities List for the Unit. Any scale model of the Unit or Condominium is only an artist's conception and is subject to change.

14.4  Due to continuing changes in products, building codes and availability of materials, the Seller reserves the right to incorporate new design features or equivalent materials at any time without notice. Additionally, variations (such as color) occurring in Units or Common Areas of building materials and finishes, such as tile, granite, carpeting in Common

11



Areas are not considered defects and will not be replaced by the Seller if variation occurs. This provision shall survive Settlement.

14.5 As of the date of this Agreement, the building permit for the Condominium building may not have been issued by the District of Columbia. Although construction documents customary in the development industry have been submitted, the District may require changes to those documents, and if that is the case, then Seller reserves the right to incorporate such changes and modify the size, configuration, and/or other features of the Unit accordingly, provided such changes do not materially and adversely affect Purchaser's use of the Unit.

15. UNIT OPTIONS.

15.1 In the event that Seller offers certain Option or Upgrades for the Unit, Purchaser may select from a list of options and upgrades offered by Seller (collectively the "Options"). The additional costs of the Options will be set forth in the materials provided to Purchaser, and are not otherwise set forth in the exhibits to this Agreement.

15.2 If Options are purchased from Seller, Purchaser shall pay Seller for one half (1/2) of the costs of the Options ("Options Deposit") upon execution of a Change Order Addendum (in the form attached hereto as Exhibit "C"). Purchaser hereby acknowledges that the Options Deposit is transferred directly into the Seller's operating account in order to carry out the implementation and installation of the Options. The balance due for the Options shall be payable at Settlement. Purchaser acknowledges the Options Deposit shall be non-refundable. Accordingly, if Settlement does not occur for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, Purchaser will forfeit the Options Deposit made to Seller under this Agreement, in addition to any other remedies that Seller may have.

16. DISTRICT OF COLUMBIA SOIL DISCLOSURE REQUIREMENT.

16.1 Purchaser confirms that Seller has advised it, pursuant to Title 45, Section 308 of the District of Columbia Code, that the soil on the subject property on which the Condominium is located is noted in the Soil Survey of the District of Columbia as Coastal Plain Geologic Province of Mid-Atlantic States (Wicomico Formation). Purchaser has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S. Department of Agriculture. Nothing herein shall constitute a representation or warranty by Seller as to the soil characteristics of the subject property on which the Condominium is located.

17. UNDERGROUND STORAGE TANKS.

17.1 In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990 as amended by the District of Columbia Underground Storage Tank

12



Management Act of 1990 Amendment Act of 1992 (D.C. Code 6-995.1 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-68 (the "Regulations"), Seller hereby informs Purchaser that Seller has no knowledge of the existence of an "underground storage tank" as that term is defined in the Act and the Regulations. Seller shall provide an Underground Storage Tank Real Estate Transfer Disclosure Form at Settlement.

18. NOTICES.

18.1  All notices and demands required or given pursuant to the terms of this Agreement shall be in writing and served by certified mail or personal delivery (including overnight courier) at the address of the Purchaser indicated below, or if to Seller:  5401 Western Avenue Residential, LLC. 4725 Wisconsin Avenue, NW, Suite 200, Washington, DC 20016.

19. DESIGNATIONS AND CAPTIONS.

19.1  In any designation hereunder, reference to the masculine gender shall be deemed to include the feminine gender wherever same may be appropriate, and the plural shall be substituted for the singular or the singular substituted for the plural in any place herein in which the context may require substitution.

19.2  The captions contained in this Agreement are for convenience only and are not to be considered a material part hereof, and are not intended in any way to limit or enlarge the terms or provisions of this Agreement.

20. INITIAL OPERATING PERIOD.

20.1  During the "Initial Operating Period", at Seller's election (i) the Seller (as Declarant of the Condominium)  shall pay the costs of operating the Condominium and (ii) each Unit Owner, in lieu of an assessment against the units for Common Expenses, shall pay to Seller a fee in an amount equal to 90% of the units' estimated monthly condominium fee for each month (or portion of a month on a pro rata basis) during the Initial Operating Period that the unit owner owns a unit.  The Seller shall not be obligated to fund or otherwise contribute to any capital or other reserve fund for the Condominium during the Initial Operating Period.  "Initial Operating Period," as defined in the Bylaws, means the period of time commencing on the date that the Condominium is created and ending on the date which is ninety (90) days after units to which 75% of the Percentage Interests appertain have been conveyed by Seller or, if sooner, two (2) years from the conveyance of the first unit, or on such earlier date as the Seller, in its sole discretion, may determine.

21. AGREEMENT EXPRESSES ENTIRE UNDERSTANDING.

21.1  This Agreement together with the "Financial Information Sheet" completed by Purchaser and delivered to Seller constitutes the entire agreement between the parties.  No

13



representations, warranties, undertakings, promises, claims, advertising or promotional activities, made or conducted by Seller, or Seller's agents or sales representatives, whether oral, implied or otherwise, shall be binding upon Seller unless the same are expressly set forth in this Agreement or in a subsequent written agreement executed by Seller. All amendments, supplements or riders hereto, if any, shall be in writing and executed by both parties.

21.2 No representations or agreements with respect to modifications or changes in the Unit or Options required or requested by Purchaser, will be recognized unless such representations or agreements are in writing, signed by the parties hereto, and any required payments for such modifications, changes or Options are made at the time of the execution of such writing.

21.3 Unless oral statements or promises are reduced to writing and included in this Agreement, such statements or promises may not be enforceable under law. By including the terms below, Purchaser and Seller are making them a part of this Agreement. THIS PARAGRAPH SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES.

The following oral statements or promises have been made by Seller, Seller's agent, sales representatives, or Purchaser. Performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:

_____NONE_____

22. COUNTERPARTS.

22.1 This Agreement may be executed in multiple counterparts, each of which, when so executed and taken together, may be considered an original.

23. TIME OF ESSENCE.

23.1 Time shall be considered of the essence in this Agreement.

14



24. RECEIPT OF PUBLIC OFFERING STATEMENT.

24.1 Purchaser hereby acknowledges that s/he has received a copy of the Public Offering Statement, and exhibits thereto, for CHASE POINT CONDOMINIUM (the "Public Offering Statement"). Purchaser hereby ratifies and agrees to be bound by the provisions of the foregoing documents, as each such document may be duly amended from time to time.

25. ACCESS TO UNIT PRIOR TO SETTLEMENT.

25.1 In order to comply with insurance requirements and to assure the safety of Purchaser and Seller's personnel, Purchaser shall not have access or entry to the Unit, the Condominium building or the property on which the Condominium building is being constructed (the "Construction Site") during construction, nor may Purchaser store any of its possessions in or about the Unit or the Construction Site prior to Settlement of the Unit and delivery of possession to Purchaser hereunder. **PURCHASER ACKNOWLEDGES AND AGREES THAT ENTRY INTO THE UNIT OR THE CONSTRUCTION SITE WITH OR WITHOUT SELLER'S PERMISSION OR ACCOMPANIED OR UNACCOMPANIED BY SELLER'S SALES REPRESENTATIVES OR PERSONNEL, SHALL BE AT PURCHASER'S, ITS AGENTS', GUESTS', CONTRACTORS', INSPECTORS' AND INVITEES' SOLE AND EXCLUSIVE RISK AND PURCHASER HEREBY WAIVES ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE INCURRED BY PURCHASER, ON OR ABOUT THE UNIT OR CONSTRUCTION SITE WHETHER CAUSED BY SELLER, ITS REPRESENTATIVES OR PERSONNEL. PURCHASER FURTHER COVENANTS AND AGREES TO INDEMNIFY, DEFEND AND SAVE SELLER AND ITS REPRESENTATIVES AND PERSONNEL HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE BROUGHT BY PURCHASER, OR ITS AGENTS, GUESTS, CONTRACTORS, INSPECTORS OR INVITEES.** Unauthorized access to the Unit or Construction Site shall be considered a trespass which may, at the election of Seller, be considered a material breach of this Agreement, and in addition to any other remedies available to Seller, Seller may declare this Agreement void, and, in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages.

_____/_____ [Purchaser's initials]

25.2 Purchaser shall have three (3) opportunities to view the Unit prior to Settlement: (1) at the orientation walkthrough to be scheduled by Seller prior to completion of the Unit, (2) at the pre-settlement inspection as set forth in Paragraph 9 herein upon substantial completion of the Unit, and (3) if necessary, one follow-up visit to the Unit following the pre-settlement inspection, but prior to Settlement on the Unit. Purchaser hereby acknowledges that no other access or entry into the Unit will be granted to Purchaser other than as set forth under

15



this Paragraph 25.2. Purchaser has read this Paragraph 25.2 and agrees to adhere to the terms of Paragraph 25 hereof.

_____/_____ [Purchaser's initials]

26. PURCHASER'S RIGHT TO CANCEL.

26.1 Seller hereby grants to Purchaser a period of fifteen (15 ) days within which to review the Public Offering Statement made available to Purchaser pursuant to the District of Columbia Condominium Act of 1976 Technical and Clarifying Amendment Act of 1992 and applicable regulations. Notwithstanding any other provision of this Agreement to the contrary, Purchaser, at his or her election, by written notice to the Seller or Seller's agent, sent by registered mail (or personal delivery to the Seller's or Seller's agent's office during business hours) at any time prior to midnight local time of the fifteenth (15th) day following the date this Agreement is accepted by the Seller, or receipt by Purchaser of a current Public Offering Statement, whichever is later, may terminate this Agreement, and thereupon the Purchaser's entire Deposit shall be refunded and the parties hereto shall have no further rights or liabilities under this Agreement.

26.2 Purchaser's Right to Cancel. [Spanish equivalent]

El vendedor permitirá al comprador un periodo de 15 días para revisar los documentos referentes a las leyes y regulaciones del Distrito de Columbia. No obstante cualquier otra provisión de este acuerdo, el comprador, podrá a su elección, responder al vendedor por medio de una carta registrada (o entregarlo personal mente a la oficina del vendedor durante las horas del trabajo) en ecualquier momento antes de la medianoche del decimoquinto día que sigue la fecha señalada en el contrato firmado por el comprado, o, que el comprado haya recibido un Anuncio de Oferta Publica corriente, lo que suceda últimamente, podrá terminar el acuerdo, el comprador recibirá su deposito y no habrá ninguna obligación entre las personas dentro de esta acuerdo.

26.3 If Purchaser terminates this Agreement pursuant to Paragraph 26 herein, Purchaser shall return to Seller all copies of the Public Offering Statement and exhibits thereto, or pay to Seller the sum of $50.00 at such time, and the parties hereto shall execute a release of this Agreement.

27. AGENCY.  CHECK IF APPLICABLE ☐

The Seller agrees to pay to Purchaser's real estate salesperson (the "Agent") (if applicable), a commission in the amount as outlined in the "PN Hoffman Sales and Design Center Broker Registration" (the "Registration Form") attached as Exhibit D hereto, and distributed in accordance with the terms and conditions as set forth therein. At Settlement on the

16



Unit, said commission is hereby assigned to the Broker as set forth on the Registration Form out of the proceeds of the sale of the Unit, and the settlement company is hereby authorized and directed to deduct the aforesaid commission from the proceeds of the sale and to make payment thereof directly to the Broker in accordance with a fully executed Registration Form. In the event that that an Agent or Broker is not identified in the Registration Form, or the Registration Form is not fully executed, Purchaser shall indemnify Seller against the claim of any other broker, salesperson or sales agent claiming through Purchaser, including any attorney's fees incurred as a result of such claim. In the event that Settlement on the Unit does not occur for any reason, Agent shall not be entitled to any commission and Purchaser shall indemnify Seller against any claim that the Agent may have to such commission, including attorney's fees incurred as a result of such claim.

28. PRIMARY RESIDENCE.

PURCHASER HEREBY REPRESENTS AND WARRANTS THAT PURCHASER INTENDS TO OCCUPY THE CONDOMINIUM UNIT AS A PRIMARY RESIDENCE. ANY MISREPRESENTATION REGARDING PURCHASER'S INTENTION TO RESIDE IN THE CONDOMINIUM UNIT SHALL CONSTITUTE A DEFAULT BY PURCHASER PURSUANT TO PARAGRAPH 12 OF THIS AGREEMENT AND SHALL RESULT IN FORFEITURE OF PURCHASER'S DEPOSIT.

_____/_____ [Purchaser's initials]

29. ARBITRATION.

ANY DISPUTE, CONTROVERSY, OR CLAIM CONCERING THE RIGHTS OR OBLIGATIONS OF THE PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CONDITION OR ELEMENT OF THE UNIT, NEIGHBORHOOD OR NEARBY PROPERTY; THE NEED OR EFFECTIVENESS OF ANY REPAIR OR REPLACEMENT UNDER THE LIMITED WARRANTY; OR ANY CLAIM OR MISREPRESENTATION, FRAUD, OR BREACH OF THIS AGREEMENT, SHALL BE SUBMITTED TO AND SETTLED BY BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, TITLE 9 U.S.C. SELLER AND PURCHASER AGREE THAT SUCH ARBITRATION SHALL BE MANDATORY AND BINDING AND SHALL BE IN LIEU OF ANY OTHER LEGAL PROCESS OR REMEDY. ARBITRATION MAY BE REQUESTED BY EITHER PARTY AND SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION ACCORDING TO ITS COMMERCIAL RULES. THE ARBITRATION SHALL AWARD ATTORNEY'S FEES, EXPERT WITNESS FEES, AND REASONABLE COSTS TO THE PARTY WHOSE POSITION IS UPHELD BY THE ARBITRATOR. SHOULD PURCHASER, IN VIOLATION OF THIS SECTION 29, COMMENCE LEGAL ACTION IN A COURT, SELLER SHALL HAVE THE RIGHT TO HAVE SUCH LEGAL ACTION DISMISSED AND TO RECOVER THE COST OF OBTAINING THE DISMISSAL. FURTHER, THE FILING

17



OF ANY LEGAL ACTION IN VIOLATION OF THIS SECTION 29 SHALL NOT SERVE TO TOLL ANY STATUTE OF LIMITATIONS OR TIME PROVISION SET FORTH IN THIS AGREEMENT, THE LIMITED WARANTY OR APPLICABLE LAW.

30. MISCELLANEOUS.

The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the District of Columbia. With respect to the Condominium and abutting properties, Seller makes no representations, oral or written, concerning future land use and reserves the right to change or discontinue unit sales, models, or any portion of the property intended for the Condominium, or alter easements areas at any time without notice. Any checks accepted by Seller shall be subject to collection and payment. Seller has designated PN Hoffman, Inc., as its authorized sales representative, for the sale of units within the Condominium.

31. ENVIRONMENTAL FACTORS.

Seller makes no warranty, either express or implied, regarding the presence or absence of radon gas, asbestos, mold, lead in water, or any other hazardous substance or contaminant (collectively, "Environmental Materials"), in, at or in the vicinity of the Condominium or the Unit(s). Purchaser acknowledges that Seller shall not be liable for any damages related to the presence of any Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s). By closing upon the Unit(s), Purchaser will be deemed to have released Seller from any and all claims and liabilities relating to or arising from the presence of Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s), and from any and all responsibility for mitigating or remediating any Environmental Materials that may be discovered in, at or in the vicinity of the Condominium or the Unit(s). Purchasers acknowledges that water supplied to the Condominium is provided by the DC Water and Sewer Authority (DCWASA), and that published reports have revealed the presence of lead in certain samples of drinking water supplied by DCWASA. Information on water supplied by DCWASA may be obtained from DCWASA, the District of Columbia Department of Health, the U.S. Environmental Protection Agency, and the U.S. Army Corps Washington Aqueduct. Purchaser acknowledges that Seller shall not be liable for any damages related to the condition of water in the Condominium or the Unit(s), including but not limited to the presence of lead in the water. This provision shall survive Settlement.

18



32.  RIGHT OF FIRST REFUSAL.

Purchaser hereby represents to Seller that Purchaser is purchasing the Unit and does not intend to sell the Unit for a period of at least twelve (12) months from the date that the Unit is conveyed to Purchaser.  In order to induce Seller to sell the Unit to Purchaser, Purchaser agrees that the deed of conveyance from Seller conveying the Unit to Purchaser shall contain a express reservation in favor of the Seller (the "Repurchase Reservation") reserving unto the Seller the right, but not the obligation, to repurchase from the Purchaser the Unit on the terms and conditions set forth below in the event that Purchaser shall attempt to sell the Unit during the period that is twelve (12) months from the date of conveyance of the Unit to Purchaser (the "Repurchase Period").

In the event that Purchaser wishes to convey the Unit during the Repurchase Period, the Purchaser shall be obligated first to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit at the same purchase price paid by Purchaser pursuant to this Purchase Agreement (the "Repurchase Right").  In the event Seller shall exercise its Repurchase Right, Seller shall thereafter be obligated to proceed to closing on the Unit within thirty (30) days following notification to Purchaser by the Seller of its exercise of the Repurchase Right.  Should Seller exercise its Repurchase Right, Purchaser shall be obligated to convey to Declarant good and marketable title by special warranty deed and free of liens and encumbrances, and subject only to those title matters as to which Purchaser took subject to on the date of the conveyance of the Unit to Purchaser.  The Unit shall also be vacant at the time of Settlement, and substantially in the same physical condition.  The Seller shall be obligated to pay for all recording costs and other settlement costs in connection with its repurchase of the Unit, provided Purchaser shall pay the District of Columbia Transfer Tax (1.1%).  Closing on the repurchase shall occur at the office of a title insurance company designated in writing by Seller.  Real estate taxes and Condominium assessments shall be adjusted to the date of the closing on the repurchase.  If Seller does not exercise its Repurchase Right, Purchaser shall be free to convey the Unit to a third party. Notwithstanding anything to the contrary contained in the Purchase Agreement, the provisions of this Paragraph shall survive Purchaser's closing on the Unit, and the repurchase rights granted to Declarant may be included in the deed of conveyance for the Unit.

The Repurchase Right shall be subordinate to the rights of any bona fide lending institution making a first deed of trust loan secured by the Unit to Purchaser hereunder and any such deed of trust lender shall take title free of all rights of repurchase in favor of Seller in the event of any foreclosure or deed in lieu of foreclosure.

19



33. PARKING RESTRICTIONS.

33.1 Purchaser acknowledges that the Condominium is subject to District of Columbia Zoning Order No. 02-17, Case No. 20-17, dated May 12, 2003, as amended by Zoning Commission Order No. 04-06/02-17A, Case No. 04-06, dated March 8, 2004 (collectively, the "Zoning Order"). The Zoning Order imposes various conditions and restrictions on the development and use of Condominium property and the owners, tenants and occupants residing therein. As a condition of the sale of the Unit to Purchaser, Purchaser agrees that, for so long as the Zoning Order is in effect, neither Purchaser nor any tenant or occupant of the Unit shall seek or obtain a residential street parking permit so long as such Purchaser, tenant or occupant resides at the Condominium. This restriction shall apply even if Purchaser does not own a Limited Common Element Parking Space, and even if there are otherwise insufficient parking spaces within the Condominium to accommodate Purchaser and/or any tenant or occupant of the Unit.

33.2 Prior to Settlement, and any time thereafter while Purchaser owns the Unit, Purchaser shall disclose to Seller and/or the Association any information requested regarding Purchaser's automobile ownership and the automobile ownership of any others who reside or will reside in the Unit.

[SIGNATURE PAGE TO FOLLOW]

20



IN WITNESS WHEREOF, the parties have executed this Agreement this *23 nd* day of *August* , 2005.

Purchaser's Address:                                    PURCHASER(s):

_4608 Massachusetts Ave. nw_                          _Linda C. Miller_
_Washington, DC 20016_                                (Purchaser's Signature)

Date: _8/22/05_                                       _____
                                                      (Purchaser's Signature)

Telephone No. _202-362-2070_                          _____
        Home _248-952-6852_                           Office

Email address: _linda.miller@thc.mills.com_           _____

SELLER:

5401 Western Avenue Residential, LLC


    By: 5401 Western PNH, LLC

    By: _____
        Authorized Agent


NOTWITHSTANDING THE DELIVERY OF A DEPOSIT, AND SELLER'S SALES
REPRESENTATIVES ACKNOWLEDGING WRITTEN RECEIPT THEREOF, THIS
AGREEMENT IS NOT BINDING UPON SELLER UNTIL ACCEPTED IN WRITING
BY SELLER.

21

## RECEIPT OF PUBLIC OFFERING STATEMENT

The undersigned acknowledge(s) that I (we) have received a Public Offering Statement for CHASE POINT CONDOMINIUM, 4301 Military Road, N.W., Washington, D.C. 20016.

Date: 8/22/05

_____
Purchaser

Date:_____

_____
Purchaser

22

Exhibit 2

## Purchase Agreement Summary
## Chase Point Condominium

In order to prepare for settlement, please review the following information concerning your purchase of the below listed Unit at Chase Point Condominium. This document will be utilized as a summary of the Purchase Agreement for mortgage lenders, underwriters and settlement attorneys.

Please review the below listed information against your records and sign where indicated if all is accurate. Please fax back to the Uptown Sales Center at (202) 966-0955.

|  |  |
|---|---|
| Unit #: | 709 |
| Parking Space(s) #: | 150 |
| Storage Space(s) #: | n/a |
| Contract Price: | $1,414,900 ✓ |
| Contract/Escrow Deposit Received: | $70,745.00 ✓ |
| Design Center Upgrades : | $3,999.00 |
| (including Change Orders, A/V & Mechoshades, NSO's, and Upgrades) | |
| Design Center Deposit Received: | $1,999.50 ✓ |
| *Total Deposit Received: | $72,744.50 |
| *Total Contract Amount: | $1,418,899.00 |

**NOTE:** *The Total Contract Amount is the total amount due for the Unit, Parking, Storage, Change Orders, A/V & Mechoshades, NSOs and Upgrades, if applicable, and does not reflect deposits,credits,or other settlement costs which shall be shown on the HUD-1 settlement statement. **NOTE:** *The Total Deposit Received is the total deposit amount received including any and all deposits paid towards Unit, Parking, Storage, Change Orders, AV & Mechoshades, NOSs and Upgrades, if applicable.

_____  2 21 07
5481 Western Ave. Residential L.L.C./Date

_____
Purchaser/Date

_____
Purchaser/Date

**Note:** If one of the Designated Lenders is utilized for financing, refer to Paragraph 3.2 of the Purchase Agreement.

Exhibit 3

# GREENSTEIN DELORME & LUCHS, P.C.

WILLIAM H. HARRIS, JR.
RICHARD G. WISE
ABRAHAM J. GREENSTEIN
GILBERT E. DeLORME
VINCENT MARK J. POLICY
RICHARD W. LUCHS
JUDITH R. GOLDMAN
JACQUES B. DePUY
JEFFREY H. GELMAN
ALAN S. WEITZ
WILLIAM C. CASANO
JOHN PATRICK BROWN, JR.
LEWIS F. MORSE
ROGER D. LUCHS
JAMES D. SADOWSKI
DONALD F. HOLMES, JR.

1620 L STREET, N.W., SUITE 900

WASHINGTON, D.C. 20036-5605

———

TELEPHONE (202) 452-1400

FACSIMILE (202) 452-1410

www.gdllaw.com

ABRIELLE B. ANDERSON
STEPHANIE A. BALDWIN
LYLE M. BLANCHARD
GREGORY T. DuMONT
ALFRED M. GOLDBERG
JOSHUA M. GREENBERG
JARED S. GREENSTEIN*
MONIC Y. HALSEY
GUY R. JEFFRESS
M. RYAN JENNESS
DAVID J. WALKER

———

*ADMITTED IN MD ONLY

Writer's Direct Dial
(202) 785-5672
RWL@GDLLAW.COM

June 7, 2007

**BY FACSIMILE (202) 686-0089 AND**
**FIRST-CLASS MAIL**

Mr. David DeSantis
Vice President, Sales and
Marketing
PN Hoffman Realty
4725 Wisconsin Avenue, N.W.
Suite 200
Washington, D.C.  20016

> Re:  **Notice of Default - Chase Point Condominium, Unit**
> **709 and LCE Parking Space 150**

Dear Mr. DeSantis:

As you know, this office represents Ms. Linda A. Miller, who has referred to us for response your letter dated May 31, 2007.  As you know and as we discussed prior to the transmission of your letter, based on the decision of the Circuit Court in Fairfax County, Virginia, in Burman v. Beeren & Barry, it is my client's position that the contract is void for failure of consideration and that therefore, she is entitled to the return of her entire deposit.

Moreover, you may not be aware that when my client executed the contract, she was informed by Mr. Avi Fisher, with whom she negotiated the contract on behalf of PN Hoffman, that if some major intervening event, such as loss of employment or illness were to occur, the developer would release her from her contract as had been done for another couple who was unable to proceed due to illness.

GREENSTEIN DELORME & LUCHS, P.C.
GREENSTEIN DELORME & LUCHS, P.C.

Mr. David DeSantis
June 7, 2007
Page 2


As my client previously informed you, she did in fact lose her employment position so that she could no longer qualify for a loan and, moreover, was ill for most of the last year with bronchitis and pneumonia which prevented her from being able to work.

Please understand that my client is still willing to consider trying to reach an amicable resolution of the dispute concerning her deposit. However, your contention that she has defaulted under the terms of her contract is rejected and, in the event that an amicable and mutually acceptable resolution is not reached, we will have no alternative but to suggest to her that she institute suit to recover the entirety of her deposit.

We trust this will not be necessary and look forward to hearing from you regarding a settlement of this matter. Best regards.

Sincerely,

Richard W. Luchs

RWL:ma
cc   Ms. Linda A. Miller
315524v1

| **I (a) PLAINTIFFS**   Linda A. Miller | **DEFENDANTS**   5401 Western Avenue Residential, LLC; 5401 Western PNH, LLC; PN Hoffman Realty, LLC and Lamont Hoffman |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Lee Co. <br> (EXCEPT IN U.S. PLAINTIFF CASES) FL | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___ DC ___ <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) <br> Robert E. Greenberg, Esq., Friedlander Misler, 1101 17th St. NW, Suite 700 Washington, D.C. 20036 (202) 872-0800 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☒ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. *Habeas Corpus/* 2255 | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
15 USC Sec. 1701 et seq. – Rescission under Interstate Land Sale Full Disclosure Act

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23  DEMAND $ $72,744.50  Check YES only if demanded in complaint JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☒ NO  If yes, please complete related case form.

DATE 12/21/07  SIGNATURE OF ATTORNEY OF RECORD *Robert E. Greenberg*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

I:\forms\js-44.wpd